## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**JOLANDA T. PAUL, on behalf of**
**BTP,**

      **Plaintiff,**

**vs.**                                                   **Case No. 1:11cv141-MMP/CAS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).   Doc. 18.   It is recommended that the decision of the Commissioner be affirmed.

## I.   Procedural status of the case

On June 14, 2006, Plaintiff, Jolanda T. Paul, on behalf of her daughter BTP, a minor child, protectively filed an application for supplemental security income benefits, alleging a disability since February 3, 1998.   R. 16, 32-34, 92, 112-17.   (Citations to the

Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)

The application was denied initially and on reconsideration.   R. 70-73, 76-79. Plaintiff, appearing pro se, requested a hearing on May 10, 2007.   R. 37.   On November 4, 2008, after Plaintiff did not attend a scheduled hearing, an administrative law judge (ALJ) dismissed Plaintiff's request for a hearing.   R. 35-38, 314-17.   After review, on June 19, 2009, the Appeals Council remanded the case with instructions that the ALJ give Plaintiff another opportunity for a hearing.   R. 40-43.   On February 23, 2010, another ALJ held a video hearing.   R. 39-41, 318-43.   Ms. Paul appeared in person and was not represented, but was advised of her right to be represented.   R. 320-24.   Ms. Paul, BTP, and BTP's brother testified during the hearing.   R. 320-42.

On June 14, 2010, the ALJ entered her Decision and found BTP was not disabled as defined under the Social Security Act (Act).   R. 13-31.   On July 1, 2011, the Appeals Council declined Plaintiff's request for review.   R. 6-8.   Thus, the ALJ's Decision stands as the final decision of the Commission.

Plaintiff sought judicial review in this Court and both parties filed memoranda of law.   Docs. 15 & 19.

Case No. 1:11cv141-MMP/CAS

## II.  Legal standards guiding judicial review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The Court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). The reviewing court is not free to reweigh the evidence or substitute its judgment for that of the Commissioner.  Bloodsworth, 703 F.2d at 1239.  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence

relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

"Unless the Secretary has analyzed all evidence and has sufficiently explained the weight

he has given to obviously probative exhibits, to say that his decision is supported by

substantial evidence approaches an abdication of the court's 'duty to scrutinize the record

as a whole to determine whether the conclusions reached are rational.'"   Cowart v.

Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

For persons under the age of 18, a claimant must show "a medically determinable

physical or mental impairment, which results in marked and severe functional limitations,

and which . . . can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.924.

A child's claim for supplemental security income benefits is analyzed by following

the rules set forth in 20 C.F.R. § 416.924, et seq.   The Commissioner "will consider the

combined effects of all [the child's] impairments upon [the child's] overall health and

functioning," and is to evaluate "any limitations in [the child's] functioning that result from

. . . symptoms, including pain."   20 C.F.R. § 416.924(a).   The claim is to be evaluated in

three steps:

1.   Is the child currently engaged in substantial gainful activity?

2.   Does the child have any severe impairments?

3.   Does the child have any severe impairments that meet, are medically
equal to, or functionally equal in severity to, an impairment listed in
Appendix 1 of 20 C.F.R. Part 404?

20 C.F.R. §§ 416.924(a)-(d).

At step two, the claimant's "physical and mental impairments(s)" are considered to determine if the claimant has "an impairment or combination of impairments that is severe."   20 C.F.R. § 416.924(a).   The claim is denied at step two if the child does not have a severe impairment.   A "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is not a "severe impairment." 20 C.F.R. § 416.924(c).

At step three, the issue of whether the impairment meets or equals a listed impairment is the same as for evaluation of an adult claim.   If the impairment neither meets nor equals a listed impairment, the Commissioner must next determine whether the impairment is functionally equal in severity to a listed impairment.   20 C.F.R. § 416.924(a).[1]

"In determining whether a child's impairment functionally equals a listing, the regulations require consideration of 'six domains,' which are 'broad areas of functioning intended to capture all of what a child can and cannot do.'"   Gibbs v. Barnhart, 130 Fed. Appx. 426, 429 (11th Cir. 2005) (citation omitted).

As to functional equivalency, the regulations provide:

If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that functionally equal the listings.   By "functionally equal the listings," we mean that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section.

---

[1]   This step is unique to child supplemental security income disability claims. There is no "residual functional capacity" determination, and no determination of ability to perform work.

20 C.F.R. § 416.926a(a); *see also* 20 C.F.R. § 416.926a(d).   The domains are:

(i)      Acquiring and using information;

(ii)     Attending and completing tasks;

(iii)    Interacting and relating with others;

(iv)    Moving about and manipulating objects;

(v)     Caring for yourself; and,

(vi)    Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i) – (vi).

"[A] 'marked' limitation in a domain [will be found] when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities."   20 C.F.R. § 416.926a(e)(2)(i).   It "means a limitation that is 'more than moderate' but 'less than extreme.'"   *Id.*

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii).

"[A]n 'extreme' limitation in a domain [will be found] when your impairment(s) interferes *very* seriously with your ability to independently initiate, sustain, or complete activities."   20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

> If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain,

and your day-to-day functioning in domain-related activities is consistent
with that score.

20 C.F.R. § 416.926a(e)(3)(iii).

The Commissioner's regulations provide that test scores are not to be relied upon

without considering other evidence, and "[n]o single piece of information taken in isolation

can establish whether you have a 'marked' or an 'extreme' limitation in a domain."

20 C.F.R. § 416.926a(e)(4)(i).   Test scores are considered "together with the other

information we have about your functioning, including reports of classroom performance

and the observations of school personnel and others."   20 C.F.R. § 416.926a(e)(4)(ii).

To decide whether the claimant has a "marked" or an "extreme" limitation, the

Commissioner:

> will consider your functional limitations resulting from all of your
> impairments, including their interactive and cumulative effects.   We will
> consider all the relevant information in your case record that helps us
> determine your functioning, including your signs, symptoms, and laboratory
> findings, the descriptions we have about your functioning from your parents,
> teachers, and other people who know you, and the relevant factors
> explained in §§ 416.924a, 416.924b, and 416.929.

20 C.F.R. § 416.926a(e)(1)(i).

> The medical evidence may include formal testing that provides information
> about your development or functioning in terms of percentiles, percentages
> of delay, or age or grade equivalents.   Standard scores (e.g., percentiles)
> can be converted to standard deviations.   When you have such scores, we
> will consider them together with the information we have about your
> functioning to determine whether you have a "marked" or "extreme"
> limitation in a domain.

20 C.F.R. § 416.926a(e)(1)(ii).

Several mental disorders are included as Listings under 20 C.F.R. Part 404, Subpart P, Appendix, Appendix, Section 112.00.   "The structure of the mental disorders listings for children under age 18 parallels the structure for the mental disorders listings for adults but is modified to reflect the presentation of mental disorders in children.   The listings for mental disorders in children are arranged in 11 diagnostic categories," including "mental retardation (112.05)."   § 112.00A Introduction.   There is a detailed explanation in the Introduction to Section 112.00 regarding the significant differences between the listings for adults and children and the structure of the listings for, in part, mental retardation under Listing 112.05.   *Id.*

The introductory paragraph for Listing 112.05 states that "mental retardation" is "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning."   *Id.* at § 112.05.

Listing 112.05 contains six sets of criteria.   If an impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the six sets of criteria, the child's impairment will meet Listing 112.05.

Material here, Listing 112.05D provides: "D. A valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant limitation of function."   *Id.* (emphasis added).   For example, in order to meet Listing 112.05D, it is not enough to simply have a physical or mental impairment.   Plaintiff must establish that the physical or mental impairment "impos[es] an additional and significant limitation of function."   *Id.* at § 112.05.

Also, for Listing 112.05D, "we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it causes more than minimal functional limitations, *i.e.*, is a "severe" impairment(s), as defined in § 416.924(c).   If the additional impairment(s) does not cause limitations that are "severe" as defined in § 416.924(c), we will not find that the additional impairment(s) imposes an additional and significant limitation of function."   *Id*, at § 112.00A Introduction.

In summary, to meet the level of severity for Listing 112.05D, a claimant must satisfy a two-prong test: (1) the child must establish the required IQ; and (2) the child must show another impairment imposing an "additional and significant limitation of function." Additionally, a claimant must satisfy the requirement contained in the introductory paragraph to Listing 112.05.   *See generally* Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (interpreting Listing 12.05); Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (same).   Plaintiff has the burden to establish that BTP meets all of the requirements of Listing 112.05D.   Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990).

## III.  Findings of the ALJ

The ALJ made several findings in her Decision regarding the issues raised in this appeal:

1.  BTP was born on February 3, 1998; was a school-age child on June 14, 2006, the date the application was filed and as of the date of the hearing.   R. 19.

2.  BTP has not engaged in substantial gainful activity since June 14, 2006.   *Id*.

3.  BTP has the following severe impairments: asthma, borderline intellectual functioning, PTSD, and depression.   *Id*.

4.  BTP does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.   *Id.*

5.  BTP does not have an impairment or combination of impairments that functionally equals the listings.   R. 20.

6.  In terms of the six functional equivalence domains listed in 20 C.F.R. § 416.926a(b)(1)(i)-(vi), BTP has *less than marked* limitation in acquiring and using information; in attending and completing tasks; interacting and relating with others; caring for herself; and health and physical well-being; and has *no limitation* in moving about and manipulating objects.   R. 20, 24-30.

## IV.  Issue

Plaintiff argues that the ALJ erred when determining that BTP's impairments did not medically meet or equal a listed impairment including Listing112.05 under 20 C.F.R Part 404, Subpart P, Appendix 1, Part B, and specifically Listing 112.05D (mental retardation) because of her asthma, depression, and post-traumatic stress disorder (PTSD) coupled with a June 2006 General Cognitive Ability test score of 72.[2]   Plaintiff specifically argues that the Differential Abilities Scale test (DAS), administered on or about June 2, 2006, R. 21, correlates so highly to standard IQ testing that BTP had a valid IQ score of 64 and, as a result, her condition meets the criteria required by Listing 112.05D, *see* n.2, *supra*, because she has a valid IQ score less than 70.   Doc. 15 at 16-17.

---

[2]   Plaintiff refers to Listing 12.05C.   Doc. 15 at 16-17.   However, Listing 12.05C applies to adults, not children.   The Introduction to Listing 112.00 states in part: "There are significant differences between the listings for adults and the listings for children. There are disorders found in children that have no real analogy in adults; hence, the differences in the diagnostic categories for children."   *Id.*, at Listing 112.00A. Introduction.   The comparable Listing for children, i.e., the Listing requiring an IQ of 60 through 70 and another impairment causing additional limitations, is Listing 112.05D.

**V.   Evidence**

  **Evidence from the administrative hearing**

  BTP was 12 years old and in the sixth grade in middle school at the time of the hearing.   R. 327.   BTP has been attending the current middle school for about four months and prior to that, other schools in Georgia.   R. 183, 199, 202, 334-36.   BTP takes six subjects and her favorite subject is language arts.   R. 328.   BTP said things were good in school this year.   R. 328.   BTP has a favorite teacher, but not a best friend at school or in the neighborhood.   BTP does not do much after school, but helps her mother, Ms. Paul, at home-cooking and cleaning.   R. 328-29.   BTP does homework in the evening and for fun, sends text messages to friends.   BTP has a computer.   R. 329.

  Ms. Paul, BTP's mother, described BTP's problems in functioning.   BTP has what Ms. Paul refers to as "emotional breakdowns.   [BTP] just cries.   [Ms. Paul] ask[s] [BTP] what's wrong.   [BTP] doesn't want [her] to bother [BTP] or touch [BTP]."   R. 320. Sometime in the morning, [BTP] "likes to hit her younger siblings.   And [BTP's] older sibling, [BTP] fights them all the time."   R. 330.   At school, "girls are bothering her. They're looking at [BTP].   [BTP] hears people saying things about [BTP]."   R. 330. Ms. Paul noticed that BTP is "struggling in school. . . . They scheduled an IEP.   [BTP] goes to counseling at Meridian twice a week.   And they just started [BTP] on new medications, depression medicines and stuff like that."   R. 330-31.

  BTP "had problems with the crying spells, waking up.   [BTP] likes to walk off, or like walk where [Ms. Paul] don't know where [BTP] is.   Sometimes [BTP] is sitting in the

car.   [Ms. Paul] does not know [BTP is] out there.   [She] goes out there.   [BTP] is

crying.   [She] ask[s] [BTP] what's wrong.   [BTP] can't give [her] an answer."   R. 337.

Before her son came back home, BTP would try to fight (with words) with her and [BTP's]

"other sister fighting and arguing all the time."   R. 337.   According to Ms. Paul, BTP does

not get along with other people.   R. 337-38.

BTP "had all Fs" in school, which caused Ms. Paul to schedule an appointment.

School personnel advised her that BTP would be retained "because [BTP] is struggling in

the areas of the work."   R. 338.

BTP has "never been suspended.   But [BTP is] always been like held in the office

with one of the counselors or the principal."   BTP never goes out or in the neighborhood

without Ms. Paul.   R. 338.   Ms. Paul confirmed that BTP sends text messages on BTP's

phone.   Ms. Paul has taught BTP how to cook.   BTP "can fend for herself as hygiene

and stuff like that.   [BTP's] hair.   [BTP's] sisters try to help [Ms. Paul] with [BTP's] hair

because it's hard for [Ms. Paul] to do it also."   R. 339.   BTP also cleans around the

house if Ms. Paul tells [BTP] "to do something."   R. 339.   But, BTP cannot "concentrate

on one thing long.   If she tells [BTP] do dishes, [BTP will] do them.   And within five to ten

minutes [BTP is] out doing something else.   I say, did you do the dishes?   No, I had to

go do this or do that.   So [BTP] never like focused on one thing."   R. 339.

BTP's older brother testified.   R. 339.   BTP and the older brother live in the same

household and he sees BTP "pretty much every day."   R. 340.   He believes BTP has a

severe case of coping with [BTP's] emotions.   BTP "tends to lash out like more

dramatically than others."   BTP gets mad "over the simplest things."   [BTP] goes "over

the top with . . . emotions."   R. 340.   BTP is "kind of weak mentally, but not as far as, like, smarts or anything.   It's just like knowing right from wrong.   Like [BTP] has a lot of problems since - - but when around others, it's like [BTP] just tends to follow a lot more than lead, because [BTP] doubts . . . a lot.   And that, I think, revolves back to the emotional state."   So all I could really say is [BTP] has a severe case of emotional disorder of some sort.   It's hard for [BTP] to control [BTP's] emotions."   R. 340-41.

The temper episodes are "kind of physical and verbal.   It's just like – kind of like Hulk when he gets mad.   It's just - - [BTP] kind of just overreacts a lot."   Like if you drank a little bit of [BTP's] soda, then [BTP] probably [would] slam the refrigerator and knock something off the counter and just stomp out of the room and [be] seriously mad over that."   R. 341.

### Medical and other evidence of record

Medical and other evidence presented to the ALJ is set forth in the ALJ's Decision at pages 19 through page 24 in conjunction with her analysis of the three-step sequential process.   R. 19-24.   The ALJ also analyzes the six functional equivalence domains in light of the evidence.   R. 24-30.

Plaintiff disagrees with the weight given to the evidence and the conclusions reached by the ALJ regarding whether BTP is disabled in light of a 2006 DAS score (General Cognitive Ability (GCA) score of 72) which, according to Plaintiff, equates to an IQ score of 70 or below during the relevant time period.   Plaintiff also argues that "when as in this case the child has multiple problems (asthma, depression and PTSD) the ALJ must consider whether the combined effect of claimant's impairments meet the second

half of listing 12.05C [sic]."   Doc. 15 at 17.   Plaintiff does not disagree with the factual

findings derived from the medical and other evidence submitted to the ALJ during the

evidentiary hearing.   *See* Doc. 15.   Accordingly, the ALJ's factual findings appearing on

page 19 through page 30 of her Decision are incorporated by reference herein.

     The ALJ's finds that BTP has several severe impairments: asthma, borderline

intellectual functioning, PTSD, and depression.   R. 19.   These findings are based on

medical evidence of June and August 2006 revealing that BTP was diagnosed with

PTSD.   The ALJ also refers to the psychological evaluation performed in June 2006 by

Ann P. Hazzard, Ph.D, ABPP, a clinical psychologist.   R. 19, 203-08.   BTP was

administered the DAS School Age Core Battery and BTP obtained a General Cognitive

Ability (GCA) score of *72* placing her "in the Borderline or 'slow learner' range, but this

was considered to be an underestimate of [BTP's] abilities due to the level of motivation

and attention during the examination and the variability of the test scores."   R. 19, 204.

     Next, the ALJ determines that BTP does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments.   The ALJ

considered the evidence in light of Listings 112.02, 112.04, and 112.05.   (Plaintiff does

not argue that BTP meets Listings 112.02 and 112.04.)   Specifically, the ALJ finds that

BTP "does not have a valid intelligence quotient score of 70 or below and [BTP] does not

have the degree of limitation in mental functioning required by the listing criteria."   R. 19.

The ALJ also discussed evaluation results in 2006 and comments from BTP's second and

third grade teachers.   R. 19-20.   Records from mid-2009 are reviewed which indicate

"reported turmoil in [BTP's] living situation, falling grades with increased emotional

response (Exhibits 5F and 7F).   When evaluated at Meridian in December 2009, the

diagnoses were [PTSD] and depressive disorder, not otherwise specified.   [BTP's] GAF

score was 55 currently and 65 in the past year, indicating moderate symptoms and/or

academic or social functioning."   R. 20.   *See also* R. 270, 312.   The ALJ concluded that

BTP "does not have more than moderate limitations in any area."   *Id.*

The ALJ then considers whether BTP has an impairment or combination of

impairments that functionally equals the listings.   At this point, the ALJ proceeds to report

her detailed findings, including a discussion of the applicability of the six domains, based

on the medical and other evidence.   R. 20-30.   In part, the ALJ discusses the results of

the examinations administered to BTP in June 2006 by Dr. Hazzard and the impact of the

test scores.   R. 21-22.   These findings are reported below.

> A review of the record shows that the claimant has been evaluated on several
> occasions.   The claimant underwent a physical examination on February 22,
> 2006, by the Children's Healthcare of Atlanta for suspected abuse.   The physical
> examination was normal (Exhibit 3F).   The claimant underwent a psychological
> evaluation on June 2, 2006, by Ann P. Hazzard, Ph.D., at the referral of her
> pediatrician, Dr. Patterson.   The claimant was 8 years old and 3 months.   She
> had had no major medical problems.   The claimant's mother was concerned
> about her short attention span and difficulty understanding and completing
> homework since first grade.   The claimant also would lose track of multi-step
> verbal instructions.   She had been more aggressive, fighting with her siblings and
> 'tearing up stuff.'   The claimant had been having crying spells for no apparent
> reason.   She was also clingy and over-affectionate to her mother and worried
> about her safety.   Her appetite has decreased.   The mother reported that her
> half-sister was moderately retarded and her sister was mildly mentally retarded.
> The claimant was administered the DAS School Age Core Battery test and she
> obtained a *General Cognitive Ability (GCA) score of 72*.   This score fell in the
> Borderline or 'slow learner' range.   Dr. Hazzard opined that the score was an
> underestimate of her abilities due to motivational and attentional problems during
> testing.   There was also significant variability in her performance on different
> types of tasks.   Dr. Hazzard indicated that the claimant exhibited a relative
> strength on the Nonverbal Reasoning Cluster, where her score of 86 was in the

Low Average range.   Dr. Hazzard reported that the claimant's performance in most academic areas was in the Average range and primarily at late second grade level, fairly consistent with her grade placement.   The claimant's second-grade teacher rated her as performing at grade level in all subjects, and being excellent in following instructions and average in completing assignments.   Her greatest concerned [sic] appeared to be the claimant's relationships with peers which she rated as 'somewhat problematic.'   Items noted as somewhat problematic included difficulty sustaining attention, avoiding tasks requiring sustained effort, easily distracted, and forgetful.   Dr. Hazzard indicated that despite some apparent learning weakness, the claimant performed at or above grade level in most subjects.   Dr. Hazzard concluded that emotionally, the claimant appeared to be exhibiting symptoms of post-traumatic stress disorder.   The claimant's teacher and mother perceived her as exhibiting some attentional problems.   The claimant's teacher did not perceive her as exhibiting hyperactive or impulsive behaviors, as her mother, nor did her teacher perceive her attentional difficulties as impacting class work completion, in contrast to her mother's perceptions of homework difficulties.   It was recommended that the claimant and her family be referred for additional counseling to help them cope with abuse-related sequela (Exhibit 1F).

R. 21-22 (emphasis added).   *See also* R. 203-08 for Dr. Hazzard's complete report.

Having considered all of the material medical and other evidence in the record, including Dr. Hazzard's assessment and BTP's test scores quoted above, the ALJ found "that the evidence does not support the conclusion that [BTP's] Borderline Intellectual Functioning, [PTSD] and Depression meet or equal any of the impairments listed in appendix I to Subpart P of Regulations No. 4, at [sic] discussed above."   R. 24.   As a result, the ALJ proceeded to determine whether [BTP's] impairments have caused sufficient limitations that would necessitate a finding that [BTP's is] functionally disabled" in light of the six domains.   R. 24.   After discussing relevant evidence regarding each domain, the ALJ concluded that BTP has *less than marked* limitation in acquiring and

using information;[3] *less than marked* limitation in attending and completing tasks; *less than marked* limitation in interacting and relating with others; *no* limitation in moving about and manipulating objects; *less than marked* limitation in the ability to care for herself; and *less than marked* limitation in health and physical well-being.  R. 25-30.  *See* 20 C.F.R. § 416.926a(b)(1)(i)-(vi)

Ultimately, the ALJ determined that BTP was not disabled since June 14, 2006, the date the application was filed.  R. 31.

## VI.  Legal Analysis

Plaintiff argues that BTP, with a GCA score of *72*, in reality has a "performance IQ of 64, which, when combined with any of her other impairments (asthma, PTSD or depression) qualifies her for disability benefits on meeting the childhood listing for mental retardation" pursuant to Listing 112.05D under 20 C.F.R Part 404, Subpart P, Appendix 1, Part B, Listing 112.05 (mental retardation).  *See* n.2, *supra*.  (No other listing number is mentioned by Plaintiff.)  Doc. 15 at 7, 16-18.

In order to meet Listing 112.05, Plaintiff must show that BTP has significantly subaverage general intellectual functioning with deficits in adaptive functioning; a valid IQ

---

[3]  The ALJ discusses this domain in light of several factors including BTP's June 2006 GCA score of *72*.  The ALJ concludes this portion of her domain analysis with the following: "The undersigned notes that serious problems in learning were noted in the most recent school year, but [BTP] has recently changed schools and significant absences were reported.  The undersigned acknowledges that [BTP] has some problems in academic functioning that have been exacerbated by changing schools and family turmoil, however, on [sic] ongoing marked level of impairment in this area is not supported as improvement is expected.  The undersigned notes, however, that a marked limitation of functioning in this area alone would not result in a finding that the listings were functionally equaled."  R. 26.

score of 60 through 70; and an additional impairment imposing additional and significant limitation of function.   *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 112.05D. Lowery v. Sullivan, 979 F.2d at 837 (interpreting Listing 12.05C).

Aside from referencing Listing 112.05D, *see* n.2, *supra*, Plaintiff does not specifically demonstrate how the record evidence satisfies *all* of the requirements of Listing 112.05D.   *See generally* Sullivan v. Zebley, 493 U.S. at 530 ("for a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.") (emphasis in original).   The Supreme Court recognized a similarly strict requirement for a claimant to show that she equaled a listing.   *Id*.

The ALJ acknowledged that BTP has some serious limitations and specifically found that BTP has several severe impairments, but no marked limitation in any of the six domains.   R. 25-30.   The ALJ refers to Dr. Hazzard's opinion, test scores, and other evidence.   Plaintiff has not referred to any of BTP's teachers, health care treatment professionals, or others, including Dr. Hazzard, who opined that BTP was mentally retarded.   "The ALJ is required to examine the [IQ test] results in conjunction with other medical evidence and the claimant's daily activities and behavior."   Pope v. Heckler, 779 F.2d 1497, 1500 (11th Cir. 1986).   And that is what the ALJ did in this case and there is substantial evidence to support the findings and conclusions reached by the ALJ.   *See* Henderson v. Astrue, 401 Fed. Appx. 449 (11th Cir. 2010).

Plaintiff quotes at length from a web site to support the argument that DAS correlates to standardized IQ testing scores.   *See* Doc. 15 at 9-16 (quoting from http://alpha.fdu.edu/psychology/Validity.htm) (last accessed May 31, 2012).   This web

site refers to Dumont Willis at the top of page one with the following title: "Differential

Ability Scales (DAS) – Validity of the DAS."   *Id.*   This web site, at page two of three,

states, "Unregistered version."   *Id*.   This web site summarizes studies apparently

derived from the "DAS Introductory and Technical Handbook (The Psychological

Corporation, 1990)" that "presented studies focusing on the concurrent, and construct

validity of the DAS."   *Id.*

　　　Based on the summary of studies of test scores administered to school-age level

children of the DAS, *id.* at pages two and three of three, Plaintiff argues that BTP's GCA

score of *72* equates to a performance IQ of 64.   Doc. 15 at 16.

　　　The author of the Differential Ability Scales: Introductory and Technical Handbook

(1990) is Colin D. Elliott.   Another web site with the title, "Pearson Clinical Assessment,"

discusses Differential Ability Scales, Second Edition and refers to the author, Colin D.

Elliott, Ph.D.[4]   Under the sub-heading, "Determination of Intellectual Disability," it is

stated: "The design structure of the DAS-II facilitates the assessment of children of very

low ability.   However, the most accurate diagnosis derives from multiple data sources,

including assessment of the individual's functioning at home, at school, and in the

community."   *Id.*, at p. 3 of 6.   On the same web site and under the heading "Research &

Resources," there is a frequently asked questions (FAQs) section and one of the FAQ's

is: "Why is DAS-II not an IQ test?"[5]   The response is: "The DAS-II measures a more

---

　　　　[4]　http://pearsonassessments.com/HAIWEB/Cultures/en-us/Productdetail.htm?
Pid=015-8338-820. (last accessed May 29, 2012).

　　　　[5]　http://pearsonassessments.com/pai/ca/research/resources/faqs/DAS-II_FAQs.

specific and narrower domain of human cognition.   Although DAS-II provides a General Conceptual Ability composite, its primary purpose is as a tool for identifying and understanding the strengths and weaknesses in individuals.   When describing an individual's performance, it is recommended that you primarily focus on patterns of cognitive strengths and weaknesses, rather than the GCA score."   *Id.*, at p. 1 of 4.

Plaintiff has not cited to any persuasive authority that would support a conclusion that first, the DAS test score is a standardized test score such that it can be determined, with any degree of precision, that it yields a valid IQ test score contemplated under Listing 112.05D, and, second, that BTP's GCA score of *72* equates to a performance IQ of 64, again as contemplated under Listing 112.05D.   *See generally* Burt v. Barnhart, 151 Fed. Appx. 817, 820 (11th Cir. 2005).

Even assuming, however, that the DAS is appropriate for use in this context, the ALJ provided appropriate reasons for concluding that the BTP did not have a valid IQ score lower than 70 in this case.   The ALJ is not required to uncritically accept the IQ scores in the record, and instead must look at the record as a whole when considering such scores.   *See* Lowery v. Sullivan, 979 F.2d at 837; Pope v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986).   *See also* Henry v. Barnhart, 156 Fed. Appx. 171 (11th Cir. 2005).

When considering BTP's cognitive abilities, the ALJ noted that Dr. Hazzard specifically found BTP's GCA score was an underestimate of BTP's abilities, reflecting BTP's motivational and behavioral concerns rather than her cognitive abilities.   R. 19,

(last accessed May 29, 2012).

21-22, 204.   The record gives no indication that BTP has been diagnosed with mental retardation or a similar developmental delay.   R. 25-26.   The ALJ concluded that BTP had Borderline Intellectual Functioning, but did not find that BTP had mental retardation or the significant deficits in adaptive functioning that would be consistent with mental retardation.   R. 19-30.

The ALJ further appropriately noted that in 2006, BTP's academic performance was average and consistent with her grade level.   R. 19-24, 207, 222.   During the following year, BTP continued to perform at grade level.   R. 19-20, 22, 168-75.   It does not appear that BTP received special education services.   R. 19-26, 161-64, 263, 273. In late 2009 and early 2010, when BTP was doing more poorly and acting out, BTP was also experiencing emotional problems while in transition and with her family.   R. 20-23, 262-76, 284, 286-96, 305-13.   During the administrative hearing, Ms. Paul and BTP's older brother focused on BTP's emotional and behavioral difficulties, rather than cognitive limitations.   R. 21, 330-31, 337-41.

Based on the foregoing, Plaintiff has not demonstrated that the ALJ erred in concluding that BTP is not disabled under the Act.

**VII.   Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and she correctly followed the law.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny

Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on June 5, 2012.


s/   Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**



<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**